UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DASHI HURSEY, # 273259,                )
                                       )
                   Plaintiff,          )          Case No. 1:11-cv-388
                                       )
v.                                     )          Honorable Robert Holmes Bell
                                       )
JOHN TAGLIA, et al.,                   )          **REPORT AND RECOMMENDATION**
                                       )
                   Defendants.         )
_____)

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983.  This

lawsuit arises out of plaintiff's most recent criminal conviction for an assault on a prison employee

at the Ionia Maximum Correctional Facility (ICF) in June 2009.  Plaintiff filed this lawsuit shortly

before his criminal trial was scheduled to begin.  On July 11, 2011, he entered a plea of *nolo*

*contendere* to the charge of assaulting a prison employee.  On August 23, 2011, he  was sentenced

in Ionia County Circuit Court to a term of 1 year and 7 months-to-5 years' imprisonment, to be

served consecutively to his underlying sentence.

Plaintiff's claims are based on perceived inadequacies in the psychological care he

received at ICF and purported instances of retaliation.  The defendants are Drs. John Taglia and

Royalle Calley, Psychiatric Social Workers Bob Davis and Robin Duiker, Unit Chief Charles

Gawne, Case Manager Okwera Okuka, and Psychiatrists Unknown Naeem and Jamie Ayala.[1]

Plaintiff alleges that all defendants were deliberately indifferent to his serious medical needs in

_____

[1]Plaintiff's complaint refers to Dr. Ayala as Dr. Ajella or Dr. Agella.  The correct spelling
of Dr. Ayala's last name is used herein.

violation of his Eighth Amendment rights.  He alleges that Dr. Taglia violated his First Amendment rights by discontinuing a Zyprexa prescription and issuing a major misconduct charge against plaintiff on September 16, 2008.  Defendants Ayala, Gawne, Davis, Calley, Naeem, and Okuka allegedly violated his First Amendment rights in June 2009 by retaliating against him in response to the series of grievances he attached to his complaint.  Defendants Ayala and Okuka allegedly violated his First Amendment rights on August 18, 2011, when Ayala stated that plaintiff had been taken off Zyprexa in retaliation for filing grievances.  Plaintiff seeks damages and declaratory and injunctive relief.

The matter is before the court on motions for summary judgment by defendants Davis, Gawne, and Okuka  (docket # 13), Duiker (docket # 38), and Taglia (docket # 50), and a motion for judgment on the pleadings by defendant Ayala (docket # 70).  Plaintiff has filed his response (docket #s 25, 26, 57, 80-82, 85-87), and defendants' motions are ready for decision.  For the reasons set forth herein, I recommend that plaintiff's claims for damages against defendants in their official capacities be dismissed with prejudice because they are barred by Eleventh Amendment immunity.  I further recommend that all plaintiff's claims against Dr. Calley and Psychiatrist Naeem be dismissed without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure for failure to make service.  This report and recommendation serves as plaintiff's notice of the impending dismissal of all his claims against defendants Naeem and Calley.  I further recommend that defendant Ayala's motion for a judgment on the pleadings be granted and that all plaintiff's claims against Dr. Ayala  be dismissed.  I further recommend that defendants' motions for summary judgment be granted and that judgment be entered in favor of defendants Davis, Gawne, Okuka, Duiker, and Taglia on all plaintiff's claims for damages against defendants in their individual capacities.

I.      **Defendants' Motions for Summary Judgment**

    A.      **Summary Judgment Standard**

        Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). The court must draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011).

        A party asserting that a fact cannot be genuinely disputed must support the assertion as specified in Rule 56(c)(1). FED. R. CIV. P. 56(c)(1). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e)(2), (3); *see Coleman v. Bowerman*, 474 F. App'x 435, 436 (6th Cir. 2012). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *see Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir.

2012).  "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Corr. Med. Servs.*, 555  F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Donald v. Sybra, Inc.*, 667 F.3d 757,  760-61 (6th Cir. 2012).

### B.    Proposed Findings of Fact

The following facts are beyond genuine issue.  Plaintiff is in the custody of the Michigan Department of Corrections (MDOC), where he is serving three sentences of 15-to-25 years imposed in 1998 on his convictions of assault with intent to rob while armed,[2] a 1-year sentence imposed in 1999 for attempted assault of a jail employee or attempted jail escape, and an August 23, 2011 sentence of 1 year and 7 months-to-5 years following plaintiff's plea of *nolo contendere* to the charge of assaulting a prison employee at the Ionia Correctional Facility (IFC) on June 17, 2009. Plaintiff was an inmate at ICF from January 10, 2008, through September 16, 2008, and again from March 19, 2009, through October 30, 2009.  (Plf. Aff. ¶ 2, docket # 86-1, ID# 598).  Plaintiff has a long history of behavioral and mental health problems.  He has received extensive psychological treatment and other medical care during his incarceration.

In 2004, plaintiff was successful in obtaining his release from administrative segregation at the Standish Maximum Correctional Facility (SMF) and a transfer to the Huron Valley Men's Residential Treatment Program (HVM RTP) based on a medical finding that he then required more intensive mental health care than could be provided at SMF.  (docket # 1-2, ID# 21).

---

[2]*See People v. Hursey*, No. 222926, 2001 WL 902722 (Mich. Ct. App. Aug. 10, 2001).

In late November 2007, plaintiff obtained a transfer from the Chippewa Correctional Facility (URF) to HVM RTP.  The referral documents describe plaintiff as very manipulative.  He would act normally for some individuals, and very psychotic, verbally and physically aggressive towards others.  His stay at HVM RTP was very brief because  he was not cooperative with treatment and he posed a serious behavioral problem.  Treatment notes reveal that Huron Valley staff members did not believe that plaintiff's behavior was the product of mental illness, but rather of his own volition.  (docket # 52-2).  The December 12, 2007 HVM RTP discharge summary stated as follows:

> During his short stay at HVM, inmate has already received three misconduct tickets, for threatening behavior and insolence toward officer, assault and battery on staff and another for threatening behavior towards officer.  His presentation has been consistent with what has already been described at URF as noted above and that is, varying with the situation and his own agenda.  He has not been involved in programming due to his non-bond status and now, reclassification to Ad-Seg with mental health appeal denied. ...  He has continued to attempt to disown responsibility for his problematic behaviors which have resulted in misconducts as well as making it difficult to involve him in treatment.

(docket # 52-2, ID#s 394-95).

### 1.    January 10, 2008 Arrival at ICF

The same pattern continued during plaintiff's ICF confinement.  (docket # 52-2, ID# 395).  On January 10, 2008, Psychiatrist John T. Taglia examined plaintiff.  Dr. Taglia's progress notes summarize his interaction with plaintiff:

> Patient was seen with case manager.  Throughout the interview the inmate appeared to [be] responding to internal stimuli.  Several times he appeared to be holding a discussion with an individual who was not present.  He would laugh inappropriately, in apparent response to internal stimuli.  When asked to whom he was speaking, he said that it was his friend, "Smoky."  He often appeared distracted and confused.  He denied any [suicidal ideation] SI or [homicidal ideation] HI.  He requested to receive some olanzapine in the evening.  When asked, he denied suffering from any side effects.

(docket # 51-5, ID# 387).  Plaintiff claimed to be medically compliant, and based on that representation, Dr. Taglia temporarily increased plaintiff's dosage of olanzapine, also known under the brand name Zyprexa.[3]  (docket # 51-5, ID# 388, docket # 52-2, ID# 395).  However, further observations revealed that plaintiff "was neither psychotic or medication compliant." (docket # 52-2, ID# 395).  Rather than presenting as being disorganized and bizarre, plaintiff was "very organized and demanding."  (*Id.*).  He continued an ongoing pattern of attempting to manipulate OPMH as a means to obtain his release from administrative segregation.  (*Id.*).  For example, on March 7, 2008, plaintiff argued that there was no need to keep him in segregation if he was mentally ill.  He stated that if he were not moved out of ICF, he might kill a custody officer.  Plaintiff did not appear delusional, but was making a threat in an effort to achieve his goal.  (docket # 15, ID# 95).

On April 1, 2008, Dr. Taglia examined plaintiff.  Plaintiff refused to leave his administrative segregation cell and demanded that he be sent back to HVM RTP.  He argued that mental heath providers should "appeal him" out of segregation.  Dr. Taglia did not agree: "variation in his behavior seems to be situational - that is, he acts out when limits are set."  Plaintiff's behavior appeared to be more volitional than the product of major mental illness.  Dr. Taglia's diagnosis remained unchanged.  (docket # 15, ID# 96; docket # 52-1, ID#s 391-92).

---

[3]Zyprexa (olanzapine) is a medication used in the treatment of schizophrenia.  *See* PHYSICIAN'S DESK REFERENCE 1850-51 (65th ed. 2011).  It is recommended that in instances of long-term usage, the physician should periodically reevaluate the usefulness of this drug for an individual patient.  *Id.* at 1852.

    2.    <u>April 16, 2008</u>

Social Worker Robin Duiker was a member of plaintiff's treatment team.  (docket # 39-2, Duiker Aff. ¶ 3, ID# 174).  Plaintiff's treatment team sought to have him transferred from detention to administrative segregation pursuant to Policy Directive 04-06-182.  (*Id.* at ID# 174).  The only way that prisoners are transferred from detention to administrative segregation is based on the recommendation of the treatment team.  Plaintiff's request for medical release from detention was denied at the second step of the review process by the panel charged with making that determination.  (Duiker Aff. ¶ 5, ID# 174).

    3.    <u>July 2, 2008</u>

On July 2, 2008, defendant Duiker met with plaintiff.  Duiker's progress notes state as follows:

> Spoke with inmate at his cell door per his request on 7/1/2008.  He identifies me as the QMHP who has been around the longest and asked that I look at his case.  I informed him that I had and that it appeared that everything that could be done for him was done for him was.  I told him that he is prescribed medication and that it is his responsibility to take it.  He reported that he has become compliant with his meds.  I also informed him that OPT was appealing him out of Ad Seg per policy but that his behavior was preventing his release.  Encouraged him to work with his case monitor to come up with strategies for managing his impulses more appropriately and dealing with the issues which trouble him.  He did not report suicidal ideation and did not appear particularly distressed-some anxiety and cloudy thoughts.

(docket # 15, ID# 98).

-7-

     4.   <u>September 16, 2008</u>

On September 16, 2008, defendant Taglia attempted to persuade plaintiff to exit his cell and participate in mental health evaluation and treatment.  Plaintiff refused.  When Dr. Taglia gave him a direct order to appear for his call out for mental health evaluation and treatment, plaintiff ignored the order.  Dr. Taglia issued a major misconduct citation for disobeying a direct order. (docket # 52-4, ID# 406; docket # 82, Plf. Aff. ¶¶ 5-6, ID#s 575-76).  A hearing officer rejected plaintiff's argument that Dr. Taglia's order directing that he come out of his cell for his mental health call-out was unreasonable.  (docket # 52-5, ID# 409).  The hearing officer found plaintiff guilty of the major misconduct.  (*Id.*).  The major misconduct conviction has never been overturned.

     5.   <u>September 24, 2008</u>

On September 24, 2008, Dr. Taglia performed a psychiatric examination.  (docket # 52-2, ID# 396).  Plaintiff was verbally abusive and refused to come out of his cell.  (docket # 15, ID# 99).  Plaintiff was "entirely uncooperative" when Dr. Taglia attempted to conduct an interview.  (*Id.* at ID# 102).  Dr. Taglia noted that plaintiff's laboratory tests "indicated that plaintiff was not medication compliant.  Due to suspicions raised by [plaintiff's] behavior about his medication compliance, labs to measure the level of olanzapine, the anti-psychotic drug that the prisoner is prescribed, were drawn on 04/02/2008 and 5/16/2008.  The results both times indicated no olanzapine was present in the prisoner[']s blood indicating the prisoner was not taking the olanzapine."  (docket # 15, ID# 101).  When Dr. Taglia made the results of the first test known to plaintiff, he denied non-compliance and subsequently refused to speak to Taglia.  (*Id.*).  Nursing staff records described plaintiff as "demanding and entitled" and during personal interviews "none of the

nursing staff felt that he had a major mental illness."  Rather, he was identified as "a player" and

"manipulative."  (docket # 15, ID# 101).  Dr. Taglia gave the following clinical summary:

> Mr. Hursey presents a very violent, primitive, characterological disturbed, antisocial
> individual.  Since being on OPMH at ICF, he has not presented as an individual with a major
> mental illness but rather as one malingering a major mental illness.  While he has claimed
> to hear voices this presentation has been noted by staff at ICF and elsewhere with his
> audience.  Staff have repeatedly noted his presentation seems to be volitional, under his
> control as it suits his needs.  For example, now that cameras are present, the prisoner has
> acted out less frequently when taken out of his cell.  Staff frequently report that Mr. Hursey
> is organized and capable when seeking to have his wants met and his behavior deteriorates
> only when boundaries are set.  Further, he has wielded his claim of mental as a weapon in
> attempts to defeat his placement in segregation, arguing that he should not be in segregation
> due to his mental illness.  He has not cooperated with treatment, instead often seeking to use
> compliance as a bargaining chip for secondary gain.  Indeed, he has even attempted to
> educate other prisoners on how to malinger.

(docket # 15, ID# 102).

Dr. Taglia emphasized that plaintiff displayed all the warning flags for malingering

set out in the DSM-IV.  (docket # 15, ID# 102).  The marked discrepancy between plaintiff's claimed

stress or disability and the objective findings was particularly noteworthy.   "[H]e actively asserts

that he is psychotic, which is contrary to the anosognosia that is the hallmark of major mental illness.

Further, while actively asserting that he is psychotic, he displays organization that is inconsistent

with the level of disability he claims."  (*Id.*).  Plaintiff's distress was secondary to his poor coping

skills "which are a hallmark of an individual with a severe personality disorder.   Indeed, his

willingness to go to great lengths to malinger rather than to go a lesser distance to comply with rules

may be seen as a sign of that personality disorder.  He presents with a personality that is so rigid and

maladaptive that the least change in behavior to conform with MDOC policy poses a major challenge

to the prisoner."  (*Id.* at ID# 103).  Dr. Taglia offered a primary diagnosis of "malingering" and a

secondary diagnosis of polysubstance dependence and an antisocial personality disorder.  (*Id.*).  Dr.

Taglia's comprehensive psychiatric examination concluded with the following proposed plan of service:

> The olanzapine the prisoner has been prescribed (and probably not been taking) will be stopped by a downward taper over the next several weeks. It is recommended that he then [be] placed on a K-6 plan. I do note that the prisoner will be resistant to this plan. Given his history, there is little doubt that he will respond by acting out. Staff should be prepared for this.

(*Id.*). Dr. Taglia recommended that the olanzapine prescription be discontinued because he had serious concerns that plaintiff was not taking the prescribed medication, and if he was taking it, it had no noticeable effect on his behavior. (Taglia Decl. ¶ 4, docket # 52-3, ID#s 403-04). MDOC staff would continue to monitor plaintiff's progress as he was tapered off the medication to determine the effect, if any, it had on his mental health condition. (*Id.*). Dr. Taglia did not provide plaintiff with any subsequent medical care. In October 2008, he left state employment to take a staff psychiatrist position in private practice. (*Id.* at ID# 403).

6.    October 2008 through May 2009

ICF progress notes suggest that plaintiff continued to pretend to be psychotic when it suited his needs. (docket # 53-1, ID# 412). On October 15, 2008, at 12:30 p.m., defendant Okuka observed that plaintiff's cell was a mess, papers were scattered all over, and there was no sheet or blanket on the mattress. When Okuka called plaintiff's name, he first looked under his bed, looked left and right as if he were psychotic, then invited Okuka to come and see "Demikus," "the invisible person that usually talks to him." When Okuka returned at 3:25 p.m., plaintiff's cell was clean, the bed was made, and plaintiff was speaking to another inmate through the window. Okuka questioned a custody officer who responded that plaintiff usually speaks clearly without any psychotic symptoms

-10-

and had never seen plaintiff's cell in the chaotic form it had taken on a few hours earlier.  On the basis of his own observations and what he had learned from the custody officer, Okuka believed that plaintiff had previously messed up his room and hidden under his bed to give the impression that he was psychotic.  Okuka's progress note concludes as follows: "This writer tends to believe that the inmate is trying to display psychotic symptoms when with this clinician and with other QMPH professionals to achieve his intended goal of transfer or to be release[d] from his assault tickets because of his mental illness.  He does not display these symptoms with non-QMHP staff." (docket # 53-1, ID# 412).

On October 21, 2008, Psychiatrist Naeem noted that plaintiff "refused to come out [of his cell] to talk to the treatment team contrary to his agreement to comply with the treatment team recommendations.  He has not been coming out of cell to talk to the MH team members either at other times." (docket # 53-2, ID# 414).   Naeem related to plaintiff that it was extremely difficult to maintain privacy and confidentiality when speaking to him through his cell door.  Plaintiff expressed an intent to cooperate in the future.  (*Id.*).

October 22, 2008 progress notes state that Unit Chief Gawne and two team psychologists went to see plaintiff.  (docket # 53-3, ID# 415).  The purpose of this encounter was to persuade plaintiff to come out of his cell and to be seen by the mental health professionals and to discuss his treatment plan.  Plaintiff responded with a flurry of profanity and refused to come out of his cell.  Gawne noted that in September 2008, plaintiff had been diagnosed as "malingering" and that nothing had changed since that time to change the clinical picture.  (*Id.*).

On October 23, 2008, defendant Okuka wrote, "Inmate has always tried to avoid the [psychiatric] team and wanted only to meet with this clinician whenever he wants to convey his

interest for transfer or to be released from his misconduct tickets.  His continuous behavior of

demanding what he wants truly confirms his diagnosis as malingering.   It should be noted that

inmate is [a] dangerous person and can hurt anybody whom he thinks is a stumbling block in his

way.  On his kite dated 10/19/09 he states:  'Smokey tells me who to kill and not to kill . . . right now

he is mad at me he says I should bite Charles Gawne['s] nose off his face.  He says Charles Gawne

is against me & trying to kill me, I have to eliminate the threat.'" (docket # 53-2, ID# 416).

   Okuka's October 27, 2008 progress notes reveal plaintiff's continued threats to kill

or bite Unit Chief Gawne, combined with a transparent intent to blame his invisible friend

"Dominguez" for his actions:

> "Dominguez wants me to kill and assault the police and the unit chief.  He wants me bite the
> unit chief's nose.["]  The unit chief and the former psychiatrist are the one[s] behind me
> being stuck in the hole and given- No treatment and No meds they [are] the one[s] and they
> [are] trying to kill me."  Although inmate tries to communicate as if "Dominguez" is the one
> authorizing him, all those working with the inmate need to be careful around him.  He might
> carry out what he intends to do and blame it on "Dominguez"- his invisible friend.

(docket # 53-2, ID# 417).

   On November 3, 2008, Okuka noted that plaintiff continued to threaten violence

against staff.  Plaintiff's health care requests included statements that he would like to bite people.

Earlier in the year, plaintiff "severely bit the arm of a custody officer during an attempt to move him

from his cell."  (docket # 53-2, ID# 420).  "Custody staff is well aware of his threats and take

appropriate precautions when interacting with him."  (*Id.* at ID# 421).  Okuka observed that

plaintiff's chart contained "numerous references to manipulative behavior in attempts to achieve

secondary gains."  (*Id.* at ID# 420).

   On November 4, 2008, plaintiff was transported to a hospital in Ann Arbor after

ingesting an unknown amount and type of medication.  He began yelling and attempting to bite

nurses.  Upon regaining consciousness after being sedated, plaintiff stated that he had taken "40 tablets of Seroquel which he found in the shower."  (docket # 53-4, ID# 424).  Plaintiff was discharged to prison the next day.  (docket # 53-4, ID# 424).

On November 9, 2008, plaintiff received a psychiatric examination at Huron Valley by Dr. Gendernalik.  Plaintiff's responses to the psychiatrist's questions were coherent and relevant "which reflected logical goal-directed thought processes, the goal being to convince the writer that he has many florid psychotic symptoms, which, [h]owever, did not seem to make him at all distractible or loose and which put him in no evident distress as he was not anxious or fearful or guarded."  (docket # 53-5, ID# 428).  Plaintiff was provided with a prescription for Zyprexa.  Dr. Gendernalik noted that plaintiff would soon be sent to another prison facility and that his medications could be altered according to clinical indications.  (*Id.* at ID# 429).

On March 3, 2009, plaintiff received a major misconduct ticket for fighting with another prisoner at the Gus Harrison Correctional Facility (ARF).  Plaintiff pleaded guilty to this major misconduct charge (docket # 51-2, ID# 275), and on March 19, 2009, he was transferred back to ICF.  During his months at ICF, before the assault giving rise to this lawsuit, plaintiff continued to receive extensive psychiatric and other medical care.  On March 19, 2009, Psychiatrist Ayala examined plaintiff.  (docket # 86-4, ID# 618).  He offered a diagnosis of schizophrenia, residual type, in remission, history of polysubstance dependence, antisocial personality disorder, and problems related to interaction with the legal system/crime.  (docket # 86-4, ID# 617).

In May 2009, plaintiff continued to amass major misconduct convictions for disobeying direct orders (docket 51-2, ID# 269-72) and for threatening to bite off the nose of a member of custody staff.  (*Id.* at ID# 267).

-13-

7.     June 2009

On June 1 and 3, 2009, plaintiff received major misconduct citations for assault and battery and threatening behavior stemming from his threats to bite and attempts to bite corrections officers. (docket # 51-2, ID# 265-68). Hearing officers found plaintiff guilty of these charges. (*Id.*).

On June 8, 2009, Dr. Ayala conducted a psychiatric examination because plaintiff was under consideration for a transfer to a less intensive, yet more supportive environment. (docket # 86-4, ID# 620). He noted that plaintiff's psychiatric history was well documented. Dr. Ayala found that plaintiff's presenting symptoms were no longer acute in nature, but residual and stable, and "no longer affected by neuroleptics or mood stabilizers." (docket # 86-4, ID# 619). Plaintiff's social functioning was such that he could conceivably be maintained off medications with adequate supervision. His overall functioning remained adequate. (*Id.*). Dr. Ayala observed that plaintiff would "ramble unintelligibly about perceived dangers from animals he dreams about and also often speaks about 'Dad and Demons' without being able to explain his jumbled ideas; he may continue to ramble if not interrupted or re-directed." (*Id.*). Ayala described plaintiff as "pleasant, alert, infantile in his clinging behavior and unable to follow a goal-directed conversation, unless he [was] re-directed continuously. Even then, most of his verbalizations [were] non-sequitur and inconsistent. He [did] not actively hallucinate during his exam, but reported 'conversations' with himself in the middle of the night." (*Id.*). Plaintiff had been "observed on and off medications, without any significant changes in demeanor, mood anxiety level or behavior." (*Id.*). Dr. Ayala's clinical summary was generally supportive of moving plaintiff to a less restrictive environment:

> Prisoner presents with an arrested form of schizophrenia which no longer shows positive symptoms, but does present with cognitive impairment, regression in his ability to have meaningful interpersonal contacts, significant autism, bland affect and dependency. He

poses no threat to self and others, if he is placed in a low-functioning level of care with adequate external controls and supervision.

He no longer benefits from neuroleptics, but, if stressed beyond his capacity by external circumstances, he could conceivably act out, requiring moderate sedation and short periods of isolation to reduce excess stimulation.

(*Id.*).  Dr. Ayala's proposed plan of service was to discontinue plaintiff's psychotropic medication. If plaintiff remained stable for a reasonable period, Dr. Ayala recommended that he be discharged from OPT and transferred to another prison facility.  (*Id.*).

On or about June 8, 2009, Dr. Ayala discontinued plaintiff's Zyprexa/olanzapine prescription.  (Plf. Aff. ¶ 4, docket # 86-1, ID# 598).  Plaintiff states that after June 8, 2009, he began to hear loud voices telling him to kill himself.  (Plf. Aff. ¶ 7, ID# 599).  His prison misconduct continued unabated.  On June 15, 2009, he was charged with major misconducts of spitting food through the food slot and striking Officer Wright.  A hearing officer later found plaintiff guilty of this charge and sentenced him to 30-days' detention.  (docket # 51-2, ID# 262).

On June 17, 2009, plaintiff attacked Sergeant Jennifer Gagne and bit her arm.  This attack resulted in plaintiff's most recent criminal conviction a consecutive prison sentence.  Plaintiff was also charged with a major misconduct and found guilty of violating prison rules.  On June 25, 2009 a hearing officer found plaintiff guilty and sentenced him to 30 days of detention.  (docket # 52-1, ID# 263).

8.    July 2009

On July 29, 2009, Dr. Ayala was forced to see plaintiff "at cell side" because plaintiff refused to participate in a formal interview.  (docket # 86-4, ID# 621-22).  He observed that after six weeks off neuroleptics, plaintiff remained unchanged, which validated the chronic/residual nature

of his illness.  Plaintiff was not actively psychotic, but the risk of his acting out dangerously remained high.  Dr. Ayala noted that plaintiff had "never cooperated with oral meds in the past – while on involuntary IM meds, he failed to demonstrate any significant positive response." (*Id.* at ID# 622).  The issue whether plaintiff should be prescribed psychotropic medication in the future as an attempt to prevent his acting out would be addressed at the time of a future transfer, as plaintiff had minimal opportunity for such misbehavior in the maximum security prison context.  (*Id.* at ID#s 621-22).

On April 15, 2011, plaintiff filed this lawsuit.  He attached nine grievances to his complaint:

Grievance No. ICF 08-04-833-28A (docket # 1-1, ID#s 8-10);
Grievance No. ICF-08-07-1598-28C  (docket # 1-1, ID#s 11-13);
Grievance No. ICF-08-09-2056-17A  (docket # 1-1, ID#s 14-16);
Grievance No. ICF-08-10-2158-28A (docket # 1-1, ID#s 17-19);
Grievance No. ICF- [illegible]-1187-[illegible] (docket # 1-3, ID# 28);
Grievance No. ICF-09-06-1383-28C (docket # 1-3, ID# 29);
Grievance No. ICF-09-07-16541-28B (docket # 1-3, ID# 30);
Grievance No. ICF-09-08-2066-12B (docket # 1-3, ID# 31); and
Grievance No. ICF-09-10-2588-23B (docket # 1-3, ID# 32).

Plaintiff would have received the same medical care and ICF housing placement if he had not filed these grievances.  (Taglia Decl. ¶¶ 3-5, docket # 52-3, ID#s 403-04; Gawne Aff. ¶¶ 3-5, docket # 14-2, ID#s 82-83; Okuka Aff. ¶¶ 3-5, docket # 14-3, ID#s 85-86 ; Davis Aff. ¶¶ 3-5, docket # 14-4, ID#s 89-90).

Shortly after he filed this civil lawsuit, plaintiff pleaded *nolo contendere* to the criminal charge of assaulting Sergeant Jennifer Gagne.  On August 23, 2011, he was sentenced to serve a consecutive 1 year and 7 months-to-5 years' imprisonment.

C.    Discussion

    1.    Mootness

Plaintiff is an inmate at the Marquette Branch Prison (MBP). No defendants are presently employed at MBP.  Plaintiff's claims for injunctive and declaratory relief against defendants are moot.  *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).

    2.    Eleventh Amendment Immunity

All plaintiff's claims for damages against defendants in their official capacities are barred by Eleventh Amendment immunity.  The Eleventh Amendment bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The State of Michigan has not consented to civil rights suits in federal court.  *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004).  A suit against a state officer in his or her official capacity is simply another way of pleading an action against the state.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *VIBO Corp. v. Conway*, 669 F.3d 675, 691 (6th Cir. 2012).  Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983.  *See Will v. Michigan Dep't of State Police*, 491 U.S. at 71.  Defendants are entitled to dismissal with prejudice of all plaintiff's claims for monetary damages against them in their official capacities.

3.      Eighth Amendment Claims

Plaintiff alleges that on April 16, 2008, Dr. Calley and Social Workers Davis and Duiker were deliberately indifferent to his serious medical needs when they "refused to have plaintiff moved" from detention into administrative segregation where his mental illness could be properly treated.  He alleges that Dr. Taglia violated his Eighth Amendment rights by discontinuing his Zyprexa prescription and by appearing at his cell door in September of 2008 when he was not plaintiff's primary therapist.  He alleges that in June 2009, Defendants Gawne, Davis, Calley, Okuka, and Naeem violated his Eighth Amendment rights by discontinuing his Zyprexa and ignoring his complaints that he was hearing voices and hallucinating.

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs, manifested by prison staff's intentional interference with treatment or intentional denial or delay of access to medical care, amounts to the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  *Estelle*, 429 U.S. at 104-05.  In judging the sufficiency of "deliberate indifference" claims, the court must view the surrounding circumstances, including the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention. *Westlake v. Lucas*, 537 F.2d 857, 860 n.4 (6th Cir. 1976).

In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court clarified the deliberate indifference standard.  Under *Wilson*, a prisoner claiming cruel and unusual punishment must establish both that the deprivation was sufficiently serious to rise to constitutional levels (an objective component) and that the state official acted with a sufficiently culpable state of mind (a

subjective component).  501 U.S. at 298.  No reasonable trier of fact could find in plaintiff's favor on the subjective component of Eighth Amendment claims against these defendants.

The objective component of the Eighth Amendment standard requires that a plaintiff be suffering from a serious medical condition.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious."  *Hudson v. McMillian*, 503 U.S. 1,  9 (1992).  "The objective component requires a plaintiff to show that 'the medical need at issue is sufficiently serious.'"  *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)); *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010).  The evidence before the court regarding plaintiff's mental illness could lead a reasonable trier of fact to find in plaintiff's favor on the objective component of an Eighth Amendment claim.

The second prong under *Estelle* requires a showing of "deliberate indifference" to plaintiff's serious medical need.[4]  The Supreme Court held in *Farmer v. Brennan*, 511 U.S. 825 (1994), that deliberate indifference is tantamount to a finding of criminal recklessness.  A prison official cannot be found liable for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety."  511 U.S. at 837.  The

---

[4]Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second-guess medical judgments and constitutionalize claims which sound in state tort law.  *See Reilly v. Vadlamudi*, 680 F.3d 624 (6th Cir. 2012); *Alspaugh v. McConnell*, 643 F.3d at 169; *Westlake*, 537 F.2d 860 n.5; *accord Minneci v. Pollard*, 132 S. Ct. 617 (2012) (refusing to imply a *Bivens* remedy against employees of a privately operated federal prison for allegedly providing inadequate medical care because state law authorized adequate alternative damages actions).

Sixth Circuit's decision in *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005), summarized the subjective component's requirements:

> The subjective component, by contrast, requires a showing that the prison official possessed a sufficiently culpable state of mind in denying medical care. Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. The prison official's state of mind must evince deliberateness tantamount to intent to punish. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference. Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Miller*, 408 F.3d at 813 (citations and quotations omitted).

Plaintiff has not presented evidence sufficient to support the subjective component of an Eighth Amendment claim for deliberate indifference to serious medical needs against any defendant. Plaintiff received extensive treatment. Psychiatrists and physicians prescribed the medications they determined were medically appropriate. Plaintiff's desire for a specific medication does not suffice at the summary judgment stage. He failed to provide evidence that the care provided by these defendants was inadequate. His apparent strategy of attempting to avoid criminal responsibility for his June 17, 2009 assault by claiming that a lack of Zyprexa prevented him from forming the requisite criminal intent proved unsuccessful. Further, his statements that he was hearing voices and hallucinating were duly recorded and viewed with medically appropriate skepticism because plaintiff's well-organized and goal-directed behavior was inconsistent with his purported mental illness. No reasonable trier of fact could find that defendants were deliberately indifferent to plaintiff's serious medical needs. I find that defendants Taglia, Davis, Duiker, Gawne, Okuka are entitled to judgment in their favor as a matter of law on plaintiff's Eighth Amendment claims.

-20-

I recommend that all plaintiff's claims against Psychiatrist Naeem and Dr. Calley be dismissed for failure to achieve service of process. These defendants have never been served with process or otherwise appeared during the seventeen months this lawsuit has been pending. Accordingly, I recommend that all plaintiff's claims against defendants Naeem and Calley be dismissed without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure. This report and recommendation serves as plaintiff's notice of impending dismissal. *See Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 623 (6th Cir. 2004); *accord Reynosa v. Schultz*, 282 F. App'x 386, 393-94 (6th Cir. 2008).

4.   First Amendment Claims

Plaintiff alleges that Psychiatrist Taglia retaliated against him by discontinuing a Zyprexa prescription and by filing a September 16, 2008 major misconduct charge against him for disobeying a direct order. He alleges that defendants Gawne, Davis, and Okuka violated his First Amendment rights by retaliating against him in response to his grievances. He alleges that defendant Okuka violated his First Amendment rights by accompanying Psychiatrist Ayala on August 18, 2009, when Ayala purportedly stated that he had taken plaintiff off Zyprexa in retaliation for the grievances he filed.

On summary judgment, a plaintiff asserting a First Amendment retaliation[5] claim must present evidentiary proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged in conduct protected by the First Amendment; (2) that an adverse action was taken against

---

[5]"Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). The plaintiff has the burden of proof on all three elements. *See, e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003).

"The first element [plaintiff] must establish for his retaliation claim[s] [are] that he was engaged in conduct protected by the First Amendment." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). The Sixth Circuit recognizes that a prisoner's filing of a grievance can constitute protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Frivolous grievances are not protected conduct. *See Hill v. Lappin*, 630 F.3d at 472; *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (calling a hearing officer a "foul and corrupted bitch" was not protected conduct); *Herron v. Harrison*, 203 F.3d at 415. I will assume for analytical purposes that plaintiff's written grievances and constituted constitutionally protected conduct.

The second element of a retaliation claim is an adverse action against plaintiff that would deter a person of ordinary firmness from engaging in the protected conduct. It is well established that "a prisoner is expected to endure more than the average citizen and enjoys no protected right to remain incarcerated in a given correctional facility." *Hix v. Tennessee Dep't of Corrections*, 196 F. App'x 350, 358 (6th Cir. 2006) (citing *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005)). "[R]outine inconveniences of prison life [] do not constitute adverse action." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 503 (6th Cir. 2011). Plaintiff has no right to the prescription medication of his choice. Further, the non-physician defendants could not prescribe any

medication.  The purported actions of defendants are not actions that would deter a person of ordinary firmness.

Under the causation element of a prisoner's *prima facie* case for retaliation, the subjective motivation of the decisionmaker is at issue.  "The third element of a First Amendment retaliation claim requires the plaintiff to prove a causal connection between the protected conduct and the adverse action.  When assessing motive in the context of a summary judgment motion, bare allegations of malice do not suffice to establish a constitutional claim.  This court has held that circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate."  *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399-400 (6th Cir. 2010) (internal quotations and citations omitted).  Plaintiff must demonstrate that his protected speech was a substantial or motivating factor in the adverse action taken by defendant.  Specifically, plaintiff must point to specific, nonconclusory evidence reasonably linking his speech to the adverse action.  *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003).  The Sixth Circuit has interpreted this inquiry to mean that a motivating factor is "essentially but-for cause-without which the action being challenged simply would not have been taken."  *Vereecke*, 609 F.3d at 400 (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007), and *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)).  "Substantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone."  *Vereecke*, 609 F.3d at 400; *see Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity standing alone, is insufficient to establish a causal connection for a retaliation claim.").

Plaintiff has not presented evidence of causation sufficient to support a First Amendment claim against any defendant.  Further, defendants have shown that the same actions would have been taken if plaintiff had not filed grievances.  I find that defendants are entitled to judgment in their favor as a matter of law on all plaintiff's First Amendment claims.

## II.     Psychiatrist Ayala's Motion for a Judgment on the Pleadings

Defendant Ayala seeks judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  Upon review, I recommend that Dr. Ayala's motion be granted and that all plaintiff's claims against Dr. Ayala be dismissed.

### A.     Rule 12(c) Standards

Defendant seeks dismissal of plaintiff's claim under Rule 12(c) of the Federal Rules of Civil Procedure.  A motion for a judgment on the pleadings is decided under the same standard as a motion under Rule 12(b)(6).  *See Roger Miller Music, Inc. v. Sony/ATV Pub., LLC*, 477 F.3d 383, 389 (6th Cir. 2007).  Rule 12(b)(6) authorizes the dismissal of a complaint for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is  and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), and FED. R. CIV. P. 8(a)(2)).  While this notice pleading standard does not require "detailed" factual allegations, it does require more than the bare assertion of legal conclusions.  *See Twombly*, 550 U.S. at 555.

-24-

Generally, when considering a Rule 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to plaintiff, accept the plaintiff's factual allegations as true, and draw all reasonable factual inferences in plaintiff's favor.[6] *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 S. Ct. 1937, 1951 (2009); *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010). Courts are not required to conjure up unpleaded allegations, nor accept unwarranted factual inferences. *See Total Benefits Planning*, 552 F.3d at 434. "To survive a motion to dismiss, [plaintiff] must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Michigan Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

---

[6]Defendant Ayala attached progress notes to the brief in support of his motion. (docket # 71-1, ID#s 505-12). The court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Plaintiff attached medical records to his pleading and he alleges that Dr. Ayala refused to provide him with Zyprexa and "proper" mental health treatment. I find that the documents attached to defendant's motion can be considered without converting his Rule 12(c) motion into a motion for summary judgment. *See Amini*, 259 F.3d at 502.

Pro se pleadings are held to a less stringent standard than formal pleadings drafted by licensed attorneys. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, even the lenient treatment generally given *pro se* pleadings has its limits. *See Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991). "A plaintiff must 'plead [] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Albrecht*, 617 F.3d at 893 (quoting *Iqbal*, 556 U.S. at 678). "A plaintiff falls short if []he pleads facts 'merely consistent with the defendant's liability' or if the alleged facts do not 'permit the court to infer more than the mere possibility of misconduct[.]'" *Albrecht*, 617 F.3d at 893 (quoting *Iqbal*, 556 U.S. at 678-79).

### B.    Plaintiff's Factual Allegations against Psychiatrist Ayala

Plaintiff alleges that defendant Ayala violated his Eighth Amendment rights when he terminated plaintiff's Zyprexa prescription. Plaintiff's disagreement with the psychiatrist's decision to terminate a prescription falls well short of alleging facts sufficient to support an Eighth Amendment claim. *See Reilly v. Vadlamudi*, 680 F.3d 624 (6th Cir. 2012). Plaintiff's First Amendment retaliation claim based on the psychiatrist's decision to terminate the prescription fares no better. I will assume for analytical purposes that at least one of the grievances plaintiff attached to his complaint was not frivolous and could be considered protected conduct. Plaintiff's purported First Amendment claim against Psychiatrist Ayala falters on the second and third elements. Discontinuing Zyprexa, a medication that was not providing a discernable medical benefit, is not an action that would deter a person of ordinary firmness. *See Thaddeus-X*, 175 F.3d at 394. Further, plaintiff has not alleged facts sufficient to indicate that the termination of Zyprexa prescription was

caused, at least in part by his grievances.  *Id.*  None of the grievances plaintiff filed before June 8, 2009, were directed against defendant Ayala.  On June 8, 2009, Dr. Ayala found that plaintiff no longer benefitted from neuroleptics.  On June 29, 2009, Dr. Ayala noted that after six weeks off neuroleptics, plaintiff's condition remained unchanged, which validated the chronic/residual nature of plaintiff's mental illness.  Plaintiff's assertion that weeks after making these medical findings, his psychiatrist came to his cell door and conceded that he had stopped the Zyprexa prescription because plaintiff had written grievances (Compl. ¶¶ 28-30) is utterly fantastic and delusional.  *See Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992).  Plaintiff has not alleged facts sufficient to establish a plausible First or Eighth Amendment claim against Dr. Ayala.  *See Iqbal*, 556 U.S. at 678.  I recommend that defendant Ayala's motion for a judgment on the pleadings be granted.

## <u>Recommended Disposition</u>

For the foregoing reasons, I recommend that plaintiff's claims for damages against defendants in their official capacities be dismissed with prejudice because they are barred by Eleventh Amendment immunity.  I further recommend that plaintiff's claims against defendants Naeem and Calley be dismissed without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure.  This report and recommendation serves as plaintiff's notice of the impending dismissal of all his claims against defendants Naeem and Calley.  I further recommend that defendant Ayala's motion for a judgment on the pleadings (docket # 70) be granted and that all plaintiff's claims against Dr. Ayala be dismissed.  I further recommend that defendants' motions for summary judgment (docket #s 13, 38, 50) be granted and that judgment be entered in favor of defendants

Davis, Gawne, Okuka, Duiker, and Taglia on all plaintiff's claims for damages against defendants in their individual capacities.


Dated:   September 10, 2012              /s/  Joseph G. Scoville
                                         United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).   General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).